IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CHRISTOPHER S. HOLMAN                                                           PLAINTIFF

    v.                            Civil No. 2:16-cv-2006-PKH-MEF

NANCY A. BERRYHILL, Acting
Commissioner, Social Security Administration[1]                        DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Christopher Holman, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration ("Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB"), child's insurance benefits ("CIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.**     **Procedural Background:**

Plaintiff filed his applications for benefits on October 25, 2012, alleging an onset date of May 1, 2003, due to juvenile diabetes type 1, attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, anxiety disorder, depression, and a hernia in his groin area. (ECF No. 10, pp. 18, 299-310, 318, 323) Plaintiff was 19 years old when he filed his applications, had a limited

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

education, and had no past relevant work. (ECF No. 10, p. 29) The Commissioner denied his applications initially and on reconsideration. At the Plaintiff's request, an Administrative Law Judge ("ALJ") held an administrative hearing on March 25, 2015. (ECF No. 10, pp. 39-63) Plaintiff was present and represented by counsel.

On July 14, 2014, the ALJ concluded that the Plaintiff's diabetes, moderate depression, and personality disorder with borderline traits were severe, but concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (ECF No. 10, p. 21) He then found Plaintiff capable of performing unskilled, light work. (ECF No. 10, p. 22) With the assistance of a vocational expert, the ALJ found the Plaintiff could perform work as a small product assembler, office helper, and warehouse checker. (ECF No. 10, p. 30)

The Appeals Council denied the Plaintiff's request for review on November 6, 2015. (ECF No. 10, p. 6-11) Subsequently, Plaintiff filed this action. (ECF No. 1) This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (ECF Nos. 12, 14)

**II.    Applicable Law:**

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court

would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.     Discussion:

On appeal, Plaintiff raises four issues: (1) whether the ALJ erred in failing to fully and fairly develop the record; (2) whether the ALJ erred at steps two and three of the sequential analysis in his evaluation of the Plaintiff's multiple mental impairments and failure to properly apply the special technique; (3) whether the ALJ erred in his RFC determination; and, (4) whether the ALJ failed to properly evaluate the Plaintiff's subjective complaints and apply the *Polaski* factors.

Plaintiff contends that the ALJ erred at step two of the sequential analysis. At step two, a claimant has the burden of providing evidence of functional limitations in support of his contention of disability. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)).

The undersigned finds this case to be particularly troubling, given the inconsistencies in the mental health diagnoses provided by the treating sources and the examining and non-examining consultants. The ALJ primarily relied on the 2013 assessment provided by consultative examiner, Dr. Steve Shry. While this is allowed in cases where the treating source evidence is internally inconsistent or contradicted by other evidence of record, the diagnoses and opinions of a treating physician are generally entitled to more weight than is the opinion of a one-time consultative examiner or a non-examining consultant. *See* SSR 96-2p; *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)); *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th

4

Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence).

We also note that the evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment. *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996). Evidence of symptom-free periods, which may negate the finding of a physical disability, do not compel a finding that disability based on a mental disorder has ceased. *Id*. Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending possibility of relapse." *Id.* Individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms, indicating that they may actually be more impaired than their symptoms indicate. *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir.2001); 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999). This limited tolerance for stress is particularly relevant because a claimant's residual functional capacity is based on "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982) (abrogated on other grounds).

In April 2012, the ALJ ordered the first consultative mental evaluation with Dr. Steve Shry. (ECF No. 10, pp. 674-677) On the Wechsler Adult Intelligence Scale III, Plaintiff obtained a verbal score of 74, a performance score of 73, and a full scale score of 71. On the Wide Range Achievement Test, he scored at the third grade level in math, the fourth grade level in spelling, and the seventh grade level in reading. After finding the test scores to be both valid and accurate, Dr. Shry diagnosed Plaintiff with adjustment disorder; depression with mild to moderate mixed anxiety features; mathematics disorder; and, borderline intellectual functioning. He opined that Plaintiff would not be able to manage funds without assistance because he was not capable of

performing basic calculations adequately and would have mild to moderate limitations performing complex tasks, sustaining concentration when completing tasks, sustaining persistence when completing tasks, and completing complex tasks within acceptable time frames due to his IQ.

In May 2013, Dr. Shry completed a second consultative examination. (ECF No. 11, pp. 178-181) Without conducting additional testing, Dr. Shry opined that Plaintiff appeared to be functioning in the low average range of intellect. *But see*, *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) (holding that IQ does not generally improve as a person ages). After interviewing Plaintiff and reviewing ten unspecified pages of Plaintiff's mental health records, he diagnosed adjustment disorder and personality disorder not otherwise specified. This time, Dr. Shry found significant impairment in the Plaintiff's social adaptive functioning, but was not asked to complete an actual RFC assessment.

Additional records reveal that the Plaintiff possessed only a tenth grade education and, when enrolled in school, was enrolled in special education classes. He did attempt to obtain his GED, but failed the pre-test and did not pursue it further. Despite reportedly applying for jobs, the ALJ found no actual employment history. (ECF No. 10, p. 48-49) Further, Plaintiff made one unsuccessful attempt to live on his own; however, he and his wife, who was receiving disability due to Marfan Syndrome, ultimately moved in with family. *See Bailey v. Apfel*, 230 F.3d 1063, 1065 (8th Cir. 2000) (claimant's reliance on family members to assist him, and his daily activities of watching television and visiting friends did not call into question his IQ results, which met criteria of Listing 12.05C).

Based on the aforementioned evidence, the undersigned finds that the record clearly shows that the Plaintiff's borderline intellectual functioning had more than a minimal impact on his ability to perform work-related activities. Thus, it should have been considered a severe impairment at

6

step two. *See Hunt v. Massanari*, 250 F.3d 622, 625-26 (8th Cir. 2001) (holding that a diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence).

Similarly, we find that the record supports the presence of additional severe mental impairments not addressed by the ALJ. It appears that Plaintiff's mental problems began at the age of 15, when his biological father was shot and killed by a neighbor. (ECF No. 10, p. 525-539) Plaintiff never really knew his father, as his father had been in and out of prison for much of his life. He was raised by his grandparents. His father's death, however, triggered a mental breakdown with symptoms to include poor grades, school absenteeism, a desire to sleep all of the time, excessive worry and restlessness, poor concentration, impulsive acts and risk taking behavior to include gang admission and substance abuse, poor judgment, loss of temper, and fighting with his peers. Plaintiff was initially diagnosed with adjustment disorder with mixed disturbance of mood and behavior and was prescribed therapy and medications. (ECF No. 10, p. 538, 660, 751) He did report some alleged medication side effects, but in March 2010, Dr. Marion Stowers opined that the Plaintiff had a history of "blaming his meds on any problems he's having whether or not they are caused by his [medication]." (ECF No. 10, p. 753)

Plaintiff discontinued therapy sessions in May 2010, but continued to report for quarterly medication management until October 2011. (ECF No. 10, pp. 660, 754-756) Dr. Stowers consistently assessed Plaintiff with a global assessment of functioning score[2] of 50, which is indicative of serious symptoms or serious impairment in social, occupational, or school

---

[2] We recognize that the DSM 5 was released in 2013, replacing the DSM-IV-TR. The DSM 5 has abolished the use of GAF scores to "rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing *Rayford v. Shinseki,* 2013 WL 3153981, at *1 n. 2 (Vet. App. 2013) (quoting the DSM 5)). However, because the DSM-IV-TR was in use at the time the medical assessments were conducted in this case, the Global Assessment of Functioning scores remain relevant for consideration in this appeal. *Rayford*, 2013 WL 3153981, at *1 n. 2.

functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM") IV-TR 34 (4th ed. 2000). Although Plaintiff voluntarily discontinued services in October 2011, records indicate that he had made little or no progress and continued to express significant "anger and defiance toward his grandmother." (ECF No. 10, p. 655, 773)

Thereafter, it does appear that the Plaintiff obtained some treatment for major depressive disorder with anxiety from his primary care physician, Dr. Darren Freeman. (ECF No. 10, pp. 688-689) He complained of intermittent anger outbursts and was prescribed Celexa[3] and Hydroxyzine.[4]

In December 2011, Plaintiff's mother reportedly found some drug paraphernalia in his bedroom. (ECF No. 10, p. 666) Concerned, she conferred with Dr. Freeman, but Plaintiff refused to submit to drug testing.

Due to medication side effects, Plaintiff unilaterally stopped the Celexa in August 2012. (ECF No. 10, pp. 684-685, 697) It was around this time that the Plaintiff's depression worsened and he became suicidal. (ECF No. 10, pp. 682-683) He reportedly held a shotgun to his chin on at least two occasions. His mother talked him down from this, and Dr. Freeman attempted to refer him to Daysprings, but Daysprings never contacted him. Further, Plaintiff refused to speak to anyone about it.

In November 2012, Dr. Charles Lewis at Daysprings diagnosed Plaintiff with bipolar I disorder, anxiety disorder not otherwise specified, and attention deficit/hyperactivity disorder combined. Plaintiff's symptoms included depressed mood, feelings of worthlessness, insomnia, mood swings, mania, impulsive acts, rapid ideas, poor judgment, verbal outbursts, anger, aggression, oppositional defiant behavior, lack of insight, and difficulty concentrating. He assessed

---

[3] Celexa is a selective serotonin reuptake inhibitor prescribed to treat depression. *See Celexa*, *at* http://www.webmd.com/drugs/2/drug-8603/celexa-oral/details (last accessed February 8, 2017).
[4] Hydroxyzine is an antihistamine that is used short-term to treat anxiety. *See Hydroxyzine*, *at* http://www.webmd.com/drugs/2/drug-7681/hydroxyzine-hcl-oral/details (last accessed February 8, 2017).

a GAF score of 45, again, indicative of serious symptomology. DSM-IV-TR at 34. There was some question as to the Plaintiff's readiness for treatment/services and his communication/learning difficulties were noted to be barriers to treatment. Following a limited response to Prozac, Dr. Lewis prescribed Symbyax[5] and Klonopin.[6] (ECF No. 10, p. 785, 787) However, in February 2013, the Symbyax was discontinued in favor of Latuda[7], after Plaintiff began experiencing nightmares. (ECF No. 10, p. 793) Following an excellent response to Latuda, Plaintiff lost his Medicaid benefits and required a less expensive medication. (ECF No. 10, p. 794) On March 4, 2013, Dr. Lewis prescribed Loxapine.[8]

A 90-day therapist review completed by his counselor, Jenni Earp, on March 23, 2013, indicated that the Plaintiff remained "very unstable" with rapid mood swings, frequent crying, anxiety, and irritability. (ECF No. 10, p. 795-798; ECF No. 11, pp. 183-186) Further, his family situation continued to be chaotic. Ms. Earp reported that Plaintiff was able to identify the consequences of his inappropriate expression of feelings, but lacked insight into the ways to stop and think prior to acting.

In April 2013, Plaintiff reported that he could no longer afford the Loxepine. (ECF No. 11, pp. 187-188) In response, Dr. Lewis increased his Klonopin dosage and prescribed Stelazine.[9] On June 17, 2013, the doctor noted the Plaintiff to be impulsive and easily distracted. (ECF No. 11, pp. 189-190) His mood was irritable and his affect labile and blunted. Plaintiff indicated he had

---

[5] Symbyax is a serotonin reuptake inhibitor used to treat depression associated with bipolar disorder. *See Symbyax*, *at* http://www.webmd.com/drugs/2/drug-78212/symbyax-oral/details (last accessed February 8, 2017).

[6] Klonopin is a benzodiazepine use to treat panic attacks. *See Klonopin*, *at* http://www.webmd.com/drugs/2/drug-920-6006/klonopin-oral/clonazepam---oral/details (last accessed February 8, 2017).

[7] Latuda is an antipsychotic used to treat schizophrenia and bipolar disorder. *See Latuda*, *at* http://www.webmd.com/drugs/2/drug-155134/latuda-oral/details (last accessed February 8, 2017).

[8] Loxapine is an antipsychotic used to treat mental/mood disorders such as schizophrenia. *See Loxapine*, *at* http://www.webmd.com/drugs/2/drug-5557/loxapine-oral/details (last accessed February 8, 2017).

[9] Stelazine is a phenothiazine antipsychotic used to treat mental/mood disorder such as schizophrenia and psychotic disorders. *See Stelazine*, *at* http://www.webmd.com/drugs/2/drug-6572-424/stelazine-oral/trifluoperazinetablet-oral/details (last accessed February 8, 2017).

not taken the Stelazine and was no longer taking the Klonopin. Dr. Lewis prescribed a trial of Risperdal[10] and refilled his Klonopin.

On June 22, 2013, Ms. Earp discharged Plaintiff from services at Daysprings due to his noncompliance and abuse of the medication prescribed. (ECF No. 11, p. 191) She noted little or no progress and an increase in the acuity of his symptoms. More specifically, Ms. Earp described Plaintiff as easily angered, exhibiting frequent mood swings; refusing to attend therapy sessions; drug seeking at times; and, refusing to take the prescribed medications. She also concluded that the Plaintiff was still in need of mental health services and recommended that he continue therapy and medication management at Counseling Associates.

In September 2013, Plaintiff presented in the emergency room with complaints of anxiety. (ECF No. 11, pp. 479-484) He stated that his ex-girlfriend had stolen his Hydrocodone and Klonopin. Dr. Michael Barnum gave him both medications and discharged him home.

Several emergency room records dated between October and December 2013 indicate that the Plaintiff was self-medicating with marijuana. (ECF No. 11, pp. 395-404, 405-409, 446-453)

In January 2014, Plaintiff was treated in the emergency room for hyperglycemia reportedly triggered by acute stress. (ECF No. 11, pp. 348-357) He was administered Lorazepam and Sodium Chloride intravenously.

On March 5, 2014, Plaintiff presented as a new patient with Dr. Robert Noonan. (ECF. No. 288-289). He was assessed with paranoid schizophrenia and bipolar disorder. Due to his impairments, Dr. Noonan advised him to seek care with an internal medicine specialist. No medications were prescribed.

---

[10] Risperdal is an atypical antipsychotic used to treat schizophrenia, bipolar disorder, and irritability associated with autistic disorder. *See Risperdal*, *at* http://www.webmd.com/drugs/2/drug-9846/risperdal-oral/details (last accessed February 8, 2017).

This is the extent of the mental health evidence before the ALJ. After the ALJ entered his decision, Plaintiff submitted three additional records to the Appeals Council. The ALJ reviewed the records, but ultimately denied review. According to those records, Plaintiff began seeking mental health services at Counseling Associates on May 9, 2014. Records indicate he was very anxious, fidgety, and desperate "to maintain stability." (ECF No. 11, p. 591) Plaintiff also reported paranoid thoughts and auditory hallucinations. Upon intake, he was assessed with schizoaffective disorder, polysubstance dependence in early partial remission, and generalized anxiety disorder. (ECF No. 11, p. 578) On June 4, 2013, Plaintiff walked out of his therapy session with James Ludwig, refusing to elaborate on the reasons for his failure to explore his housing options with the housing authority. (ECF No. 11, p. 576) There had been no improvement in his home/family situation, and Plaintiff was "hiding from everyone" to prevent others in the home from pushing him around.

On June 24, 2014, Mr. Ludwig indicated that the Plaintiff was "not ready to pursue [the] indicated objectives in any meaningful way at this time. Client wants to maintain goals but pursue them at a much slower pace." (ECF No. 11, pp. 570-571) Mr. Ludwig worked on developing rapport with the Plaintiff and building his trust, noting a guarded prognosis and no progress towards his goals. (ECF No. 11, 572-573) Further, he assessed Plaintiff with a GAF score of 29, which is indicative of behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment, or an inability to function in almost all areas (e.g., stays in bed all day; no job, home). Plaintiff ultimately agreed to remain involved in treatment and requested therapy sessions every two weeks, rather than once monthly.

Because Mr. Ludwig's records were not before the ALJ, the ALJ made no mention of Plaintiff's schizoaffective disorder. He did acknowledge Plaintiff's bipolar diagnosis in his

11

discussion of the medical evidence, but failed to include it in his step two analysis. It appears that the ALJ chose to disregard Plaintiff's bipolar diagnosis due to his alleged treatment noncompliance.[11] After spending a great deal of time discussing it, the ALJ asserted that Plaintiff's noncompliance was not the primary basis for his decision; however, it is clear from a reading of the opinion that he gave it great weight. (ECF Doc. 10, p. 28-29) While we do agree that the record reveals periods during which Plaintiff did not take his medication or refused to participate in therapy,[12] we are also aware that it is not uncommon for patients suffering from bipolar disorder and/or schizoaffective disorder to discontinue treatment at will. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 5 (DSM-5) 129 (5th ed. 2013); Charolette E. Grayson, *Bipolar Disorder: Taking Your Bipolar Medication*, *at* www.webmd.com. According to the DSM, patients suffering from schizoaffective disorder and bipolar disorder suffer from anosognosia or poor insight. DSM-5 at 129; DSM IV-TR 304, 321, 359 (4th ed. 2000). "Evidence suggests that poor insight is a manifestation of the illness, rather than a coping strategy. . . . This symptom predisposes the individual to noncompliance with treatment and has been found to be predictive of higher relapse rates, an increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness." DSM IV-TR at 304, 321, 359. Federal courts have recognized that a mentally ill[13] person's noncompliance with psychiatric medications can be, and often is, caused by the underlying mental impairment and, therefore, is "neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (citing *Mendez v.*

---

[11] And, we note that the criteria for bipolar disorder is described in Listing 12.04(A)(2), while depression is described in Listing 12.04(A)(2), anxiety disorder in Listing 12.06, and schizoaffective disorder is covered by Listings 12.03 and 12.06.

[12] We note that this appears to be more of a problem with regard to his physical impairments, where the evidence indicates that the Plaintiff's repeated failure to take his insulin as prescribed and monitor his blood sugar levels has led to numerous episodes of ketoacidosis.

[13] So far, this analysis has only been applied to individual's suffering from bipolar disorder, schizoaffective disorder, and schizophrenia.

*Chater,* 943 F.Supp. 503, 508 (E.D.Pa. 1996); *Sharp v. Bowen,* 705 F.Supp. 1111, 1124 (W.D.Pa. 1989); *Frankhauser v. Barnhart,* 403 F.Supp.2d 261, 277-78 (W.D.N.Y. 2005); *Brashears v. Apfel,* 73 F.Supp.2d 648 650-52 (W.D.La. 1999) (each holding ALJ must consider whether a claimant's failure to comply with treatment results from his/her bipolar disorder, schizophrenia, and/or schizoaffective disorder)). Thus, while there may be evidence to show the Plaintiff knew he needed to take his medication, this evidence does not resolve the relevant question here: whether his failure to follow the prescribed treatment was a manifestation of his schizoaffective and/or bipolar disorders or a blatant disregard of the prescribed treatment. Because the ALJ failed to consider this possibility, we cannot say that substantial evidence supports the ALJ's dismissal of Plaintiff's subjective complaints on this basis alone. Accordingly, on remand, the ALJ is directed to recontact Dr. Lewis, Ms. Earp, and Mr. Ludwig and obtain their opinion as to the connection, if any, between Plaintiff's treatment non-compliance and his bipolar and/or schizoaffective disorder.

The record also suggests some drug seeking behavior and drug usage by the Plaintiff before and during the relevant time period. The Plaintiff testified that he used marijuana to self-medicate. (ECF No. 10, p. 59) While the ALJ correctly determined this usage was not a contributing factor material to the determination of disability, he did use it as a means of further discrediting the Plaintiff's subjective complaints. Bipolar disorder can precipitate substance abuse as a means by which the sufferer tries to alleviate their symptoms. Li-Tzy Wu, et al., "Influence of Comorbid Alcohol and Psychiatric Disorders on Utilization of Mental Health Services in the National Comorbidity Survey," 156 *Am. J. Psychiatry* 1235 (1999); Edward J. Khantzian, "The Self-Medication Hypothesis of Addictive Disorders: Focus on Heroin and Cocaine Dependence," 142 *Am. J. Psychiatry* 1259, 1263 (1985). At least one major study has shown that "more than forty-two percent of patients meeting the criteria for a major depressive disorder (including bipolar

13

disorder) had lifetime histories of substance abuse." *See* Kim S. Griswold and Linda F. Pessar, *Management of Bipolar Disorder,* 62 AM. FAMILY PHYSICIAN 1343, 1343 (2000). Yet another study has reportedly shown that "the frequency of substance abuse was thirty-nine percent in adolescents who had symptoms of bipolar disorder." *Id*. Accordingly, the undersigned finds that this issue requires further consideration by the ALJ. The ALJ is directed to develop the record in this regard, by recontacting the Plaintiff's treating mental health professionals.

Additionally, we find that the RFC restricting Plaintiff only to light work involving simple, routine, and repetitive tasks; simple work-related decisions; few, if any workplace changes; and, no more than incidental contact with co-workers, supervisors, and the general public does not adequately account for the combined limitations arising from Plaintiff's borderline intellectual functioning, bipolar I disorder, and schizoaffective disorder. Further, we note that the RFC assessments contained in record were prepared by non-examining consultants. Thus, on remand, the ALJ is directed to reevaluate Plaintiff's RFC in light of all of his mental impairments. In so doing, the ALJ should submit RFC assessments to Plaintiff's treating mental health professionals. If the ALJ is unable to obtain assessments from Plaintiff's treating physicians, he is directed to order a consultative mental evaluation and to obtain a complete mental RFC assessment from said consultant. In so doing, the ALJ is further directed to provide the consultant with a complete set of Plaintiff's medical records from both Daysprings and Counseling Associates.

There is also a question as to whether the Plaintiff received child disability benefits based on a prior application or was receiving dependent's benefits based on his father's disability and/or death. In his decision, the ALJ disputed Plaintiff's contention that he received child disability benefits based on his own disability and used this alleged inaccuracy as a means to discredit his testimony. Plaintiff's counsel, Laura McKinnon, contends that she represented Plaintiff in that

action. She asserts that Judge David Hubbard awarded Plaintiff child disability benefits on November 23, 2004. There is, however, nothing objective in the record to allow this Court to settle the issue. Because this matter is being remanded on other grounds, on remand, the ALJ is also directed to perform a thorough investigation of all prior applications for benefits filed by the Plaintiff or on the Plaintiff's behalf. If it is determined that the Plaintiff did, indeed, receive child benefits due to his own disability, the ALJ must take this into account prior to rendering a decision on appeal.

**IV.    Conclusion:**

Based on the foregoing, we recommend reversing and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 9th day of February, 2017.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

15